UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
JUN 30 2008
JUN 3 0 2008
RONALD A. GUZMAN, JUDGE
UNITED STATES DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | No. 07 CR 799 |
| vs. ) | |
| ) | Judge Ronald A. Guzman |
| JERRY LEFT ) | |

## PLEA AGREEMENT

1. This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and defendant JERRY LEFT, and his attorney, THOMAS M. DURKIN, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(C), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charge in This Case

2. The indictment in this case charges defendant with conspiracy to knowingly and intentionally distribute and possess with intent to distribute controlled substances, namely, more than 500 grams of mixtures containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, and quantities of 3,4-methylenedioxymethamphetamine (commonly known as "Ecstasy" or "MDMA"), a Schedule I Controlled Substance, and mixtures containing marijuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2 (Count One).

3.　　Defendant has read the charge against him contained in the indictment, and that charge has been fully explained to him by his attorney.

4.　　Defendant fully understands the nature and elements of the crime with which he has been charged.

## Charge to Which Defendant is Pleading Guilty

5.　　By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Count One of the indictment. Count One charges defendant with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

## Factual Basis

6.　　Defendant will plead guilty because he is in fact guilty of the charge contained in Count One of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct under Guideline § 1B1.3:

Beginning no later than in or about Spring 2004, and continuing until in or about January 2005, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, JERRY LEFT, defendant herein, conspired with the co-defendants in this case and others to knowingly and intentionally possess with the intent to distribute and distribute controlled substances, namely, mixtures containing MDMA, a Schedule I Controlled Substance, and mixtures containing marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

In particular, in approximately Spring 2004, LEFT began to participate in the drug trafficking operation based on the north side of Chicago run by co-defendant Ivan Myint who, as LEFT well knew, was engaged in the distribution of wholesale amounts of MDMA and hydroponic marijuana to various drug dealers around the Chicago area. LEFT knew that the sources for the MDMA and hydroponic marijuana were from Canada. LEFT's activity for Ivan Myint included, among other things, (a) storing wholesale amounts of MDMA and hydroponic marijuana to be distributed to Ivan Myint's drug customers, (b) repackaging MDMA and hydroponic marijuana for delivery of the drugs to Ivan Myint's drug customers; (c) delivering MDMA and hydroponic marijuana to Ivan Myint's customers; (d) collecting of drug proceeds from Ivan Myint's drug customers who had purchased MDMA and hydroponic marijuana; and (e) at Ivan Myint's direction, transporting and delivering drug proceeds to the Canadian sources as payment for the drugs that Ivan Myint purchased from those sources. LEFT also did other tasks for the drug trafficking operation at the direction of Ivan Myint. In carrying out his duties, LEFT occasionally worked and interacted with other members of Ivan's Myint's "crew," which included co-defendants Michael Cruz, Roberto Valdez (known to LEFT as "Rob") and Hubert Chow (known to LEFT as "Hubert"). Michael Cruz ("Cruz") was a Latin King gang member who proclaimed himself to be, and was recognized by Ivan Myint to be, the second-in-command of Ivan Myint's drug trafficking crew.

In late June 2004, LEFT attended a meeting at a Korean restaurant on the north side of Chicago at which Ivan Myint met with the Canadian drug sources and other persons involved in the drug trafficking operation. Two people who attended the meeting on behalf of the Canadian sources were co-defendants Kenneth Quoc Luong (known to LEFT as

"Ken") and Ju Wen Zhou (known to LEFT as "Goi"). The meeting was also attended by co-defendants Sejin Oh, Jong Kyun Chae (known to LEFT as "Big John"), Thomas Man Lung Lo (known to LEFT as "Tommy") and Li Xin Wu (known to LEFT as "Ray"). LEFT sat at a nearby table with Ivan Myint's wife, while Ivan Myint and the other participants conducted their meeting at a single table. Ivan Myint later told LEFT that the discussion between participants concerned how they would all work together to sell MDMA and hydroponic marijuana. Thomas Man Lung Lo ("Lo") served as a translator for the meeting.

In Fall 2004, Ivan Myint instructed LEFT that Ivan Myint had purchased a load of 30,000 MDMA pills from the Canada sources. Ivan Myint instructed LEFT and Valdez to receive the load. LEFT and Valdez met the couriers who delivered the 30,000 MDMA pills to the Chicago area. LEFT and Valdez then drove with the couriers (in separate cars) to meet with co-defendant Jorge Huerta ("Huerta"), who was to receive 10,000 MDMA pills from the load. Huerta then directed the couriers to a garage on the north side of Chicago, within which the couriers delivered 10,000 MDMA pills to Huerta. Huerta then gave the remaining 20,000 MDMA pills to LEFT. At Ivan Myint's direction, LEFT thereafter distributed the remaining 20,000 MDMA pills to Ivan Myint's drug customers or other members of Ivan Myint's crew.

Later in Fall 2004, also at Ivan Myint's direction, LEFT received a load of approximately 100 pounds of hydroponic marijuana that Ivan Myint had purchased from the Canadian drug sources. The marijuana was hidden in several card board boxes, each containing aluminum cooking trays. The marijuana was actually hidden inside the aluminum trays, which were stacked on top of one another. Some of the trays in the middle of the stack had their bottoms cut out in order to better store and hide the

marijuana. LEFT distributed the marijuana to Ivan Myint's customers at Ivan Myint's direction.

On January 11, 2005, LEFT attempted to pick up $5,000 in drug proceeds that represented approximately 922 MDMA pills that Ivan Myint had sold to the government's confidential source ("CS1") on January 9, 2005.

During the course of the conspiracy, LEFT made multiple trips to Canada to deliver drug proceeds to Kenneth Quoc Luong ("Luong") as payment from Ivan Myint to Luong for MDMA and hydroponic marijuana that Ivan Myint purchased from Luong. On multiple occasions, LEFT also delivered drug proceeds to money couriers who then transported the money to Canada as payment to Luong for drugs purchased by Ivan Myint. One of the couriers to whom LEFT delivered drug proceeds as payment to Luong was co-defendant Susan Chen (whose true name was not known to LEFT). LEFT also met other money couriers in Niagara Falls, New York.

In December 2004, at Ivan Myint's instruction, LEFT obtained a 9 millimeter handgun from another person for Ivan Myint, who could not purchase a gun due to his prior felony conviction for drug trafficking. A couple weeks after obtaining the gun from the other person, LEFT, at Ivan Myint's direction, gave the gun to Cruz.

The amount of drugs that the government can prove to have been involved in LEFT's offense was approximately 7,699.83 grams of mixtures containing MDMA, and approximately 45.45 kilograms of marijuana.

7.  Defendant disclosed the following self-incriminating information to the government pursuant to the terms of a proffer agreement. Pursuant to Guideline §1B1.8(a), this information may not be used in determining the applicable guideline range

for defendant:

Immediately after the meeting at the Korean restaurant in late June 2004, as summarized in the previous paragraph, Ivan Myint instructed LEFT to follow co-defendant Li Xien Wu ("Wu") to Chinatown in order to pick up 20 pounds of hydroponic marijuana that Ivan Myint had purchased from the Canadian drug sources. LEFT followed Ivan Myint's instructions and followed Wu to a warehouse on Canal Avenue near Chicago's Chinatown neighborhood. Wu then took LEFT's car and drove away. Wu returned a short time later with LEFT's car, which had approximately 20 pounds of hydroponic marijuana in the trunk. At Ivan Myint's instruction, LEFT then delivered marijuana to several of Myint's customers and collected the money from the sale of the marijuana.

Around the same time as the meeting at the Korean restaurant, Ivan Myint began to purchase MDMA from Sejin Oh and Lo. LEFT picked up MDMA purchased by Ivan Myint from both Sejin Oh and Lo. On at least three separate occasions, LEFT picked up several thousand MDMA pills from co-defendant Andrew So (known to LEFT as "Andy"), who stored MDMA for Sejin Oh. On two of the three occasions, LEFT picked up MDMA from Andrew So's apartment and, on one occasion, LEFT picked up MDMA from Andrew So's car wash in Skokie, Illinois. On another occasion, Ivan Myint purchased 1,000 MDMA pills from Lo. On that occasion, Ivan Myint ordered LEFT to meet Lo in Chinatown to pick up 1,000 MDMA pills from Lo. LEFT then met with Lo in Chinatown. At the meeting, Lo provided to LEFT approximately 1,000 MDMA pills that Ivan Myint had purchased from Lo.

During this time frame, Ivan Myint also purchased hydroponic marijuana from Sejin Oh, Wu and Jong Kyun Chae ("Chae"). LEFT often picked up the marijuana that Ivan Myint purchased from Sejin Oh or Chae at an apartment on north Western Avenue that Ivan

Myint and Sejin Oh referred to as the "Warehouse." LEFT picked up MDMA or hydroponic marijuana from the Warehouse on approximately 20 occasions. Wu usually "fronted" to Ivan Myint approximately 10-20 pounds of hydroponic marijuana approximately every week, provided that Ivan Myint repaid Wu for hydroponic marijuana that Ivan Myint had purchased from Wu on the previous week. LEFT picked up hydroponic marijuana that Ivan Myint purchased from Wu by meeting Wu in Chinatown. On each occasion, Wu followed the same pattern of taking LEFT's car to another location and loading the marijuana into the car before returning the car to LEFT. At Ivan Myint's direction, LEFT paid Wu for the marijuana purchases by providing Wu or his cousin with the payment for previously fronted hydroponic marijuana. At one point, LEFT became aware that Ivan Myint owed Wu and his cousin approximately $10,000 for prior purchases of hydroponic marijuana.

In late August of 2004, Ivan Myint informed LEFT that Sejin Oh owed the Canadian sources approximately $60,000 for past drug purchases and that Ivan Myint was going to thereafter deal directly with the Canadian drug sources. LEFT then accompanied Ivan Myint to two meetings between Ivan Myint and co-defendant Ju Wen Zhou ("Zhou") to discuss Ivan Myint's future drug purchases from Zhou. LEFT was not present for the first meeting (LEFT remained in his car during the meeting), but was present at the second meeting at which Ivan Myint gave approximately $20,000 to Zhou as a payment toward future drug deliveries. Both of these meetings happened at a restaurant in Chinatown.

In early November of 2004, Ivan Myint told LEFT that Ivan Myint and Valdez intended to travel to Canada to meet with Luong so that they could "take over" Sejin Oh's drug operation. After Ivan Myint and Valdez returned from Canada, Ivan Myint instructed LEFT to contact Luong in order to take deliveries of MDMA pills and marijuana.

Ivan Myint thereafter purchased three loads of drugs from Luong. The first load consisted of 30,000 MDMA pills and the second load consisted of 100 pounds of hydroponic marijuana. The subsequent distribution of the drugs from these loads is discussed above in paragraph 6. The third load also consisted of 30,000 MDMA pills. Cruz and Valdez received the third load of MDMA pills just before Christmas 2004 and brought the MDMA pills to LEFT's residence so that LEFT could store the MDMA pills at his residence. LEFT turned Cruz and Valdez away because other people were inside LEFT's residence at the time. Ivan Myint thereafter informed LEFT that Cruz and Valdez had taken the MDMA pills to the residence of co-defendant Michael Myint.

The approximately 30,000 MDMA pills from the third load remained in Michael Myint's residence for several days. On several occasions during that time, Ivan Myint instructed LEFT to call Michael Myint to arrange the pick up thousands of MDMA pills from Michael Myint's condominium. As Ivan Myint instructed, LEFT thereafter called Michael Myint and arranged to pick up the MDMA pills. During those calls, LEFT and Michael Myint used code like "vitamins" and "phones" to discuss the drugs. The term "vitamins" was code for MDMA pills and the term "phones" was code for marijuana.

On the first occasion, Ivan Myint told LEFT to pick up a couple thousand pills from Michael Myint's residence, which was a condominium unit in Chicago. However, when LEFT went to Michael Myint's condominium, Michael Myint had left the MDMA pills sitting inside the garbage can just outside of his condominium. LEFT knew the MDMA pills were inside the garbage can because Michael Myint had informed LEFT of that fact. When LEFT picked up the MDMA pills, they were in a clear plastic bag that was contained inside another plastic bag that was not clear. LEFT then delivered the pills to one of Ivan Myint's

drug customers. On the next two occasions, LEFT picked up approximately 1,000 MDMA pills from Michael Myint. Both trips occurred on the same day. On both occasions, Ivan Myint instructed LEFT to pick up the pills. After Ivan Myint instructed LEFT to pick up the MDMA pills, LEFT contacted Michael Myint on the phone and arranged to pick up the MDMA pills. On both occasions, LEFT met with Michael Myint inside his condominium and, inside the condominium, Michael Myint retrieved the pills from a room inside the condominium and handed the pills to LEFT. The MDMA pills were stored inside a clear plastic bag.

In late December 2004, while the MDMA pills were being stored at Michael Myint's residence, Ivan Myint instructed LEFT to deliver a 9 millimeter Beretta handgun and a .38 caliber revolver to Michael Myint's condominium, along with the drug ledgers that LEFT then had in his possession. LEFT had previously received the 9 millimeter Beretta from Ivan Myint and the .38 caliber revolver from Sejin Oh, who gave it to LEFT at Ivan Myint's direction. LEFT then hand-delivered the guns and the drug ledgers to Michael Myint at Michael Myint's condominium. The guns and the drug ledgers were inside of a steel case at the time LEFT gave them to Michael Myint.

Also in late December 2004, Ivan Myint informed LEFT that Sejin Oh and Lo had been arrested. Soon after that, Ivan Myint ordered that the MDMA pills be moved from Michael Myint's residence to Hubert Chow's residence. LEFT then picked up MDMA pills at Ivan Myint's direction from Hubert Chow's residence.

8. The foregoing facts in Paragraphs 6 an 7 above are set forth solely to assist the court in determining whether a factual basis exists for defendant's plea of guilty and to identify statements made subject to Guideline § 1B1.8(a), and are not intended to be a

complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crime and related conduct.

## Maximum Statutory Penalties

9. Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

    a. A maximum sentence of 20 years' imprisonment. This offense also carries a maximum fine of $1,000,000. Defendant further understands that the judge also must impose a term of supervised release of at least three years, and up to any number of years, including life.

    b. In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty imposed.

## Sentencing Guidelines Calculations

10. Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

11. For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

    a. **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual

currently in effect, namely the November 2007 Guidelines Manual.

    b.    **Offense Level Calculations.**

    i.    Pursuant to Guideline §§ 2D1.1(a)(3) and (c)(3), the base offense level is 34 because defendant's offense including relevant conduct involved approximately 7,699.83 grams of mixtures containing MDMA, and approximately 45.45 kilograms of marijuana, which, pursuant to Guideline § 2D1.1(c) (drug equivalency table), is equivalent to approximately 4,335.07 kilograms of marijuana.

    ii.    Pursuant to Guideline § 2D1.1, a two-level increase is appropriate because a dangerous weapon was possessed during the offense.

    iii.    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

    iv.    In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c.  **Criminal History Category.** With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government and stipulated below, defendant's criminal history points equal zero and defendant's criminal history category is I.

d.  **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the anticipated offense level is 33, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory Sentencing Guidelines range of 135 to 168 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

e.  Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional Guideline provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f.  Both parties expressly acknowledge that this plea agreement is not governed by Fed.R.Crim.P. 11(c)(1)(B), and that errors in applying or interpreting any of

the Sentencing Guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

### Cooperation

12. Defendant agrees he will fully and truthfully cooperate with the United States Attorney for the Northern District of Illinois in any matter in which he is called upon to cooperate. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil or administrative proceeding. Only the United States Attorney for the Northern District of Illinois may require defendant's cooperation pursuant to this Plea Agreement. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

### Agreements Relating to Sentencing

13. At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this plea agreement, then the government shall move the Court, pursuant to Guideline § 5K1.1, to depart from the applicable Guideline range and to impose the specific sentence agreed to by the parties as outlined below. Defendant understands that the decision to depart from

the applicable guidelines range rests solely with the Court.

14. If the government moves the Court, pursuant to Sentencing Guideline § 5K1.1, to depart from the applicable guidelines range, as set forth in the preceding paragraph, this Agreement will be governed, in part, by Federal Rule of Criminal Procedure 11(c)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons of 66 percent of the low end of the applicable guidelines range. Other than the agreed term of incarceration, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes the agreed term of incarceration set forth, defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(d) and (e). If, however, the Court refuses to impose the agreed term of incarceration set forth herein, thereby rejecting this plea agreement, or otherwise refuses to accept defendant's plea of guilty, either party has the right to withdraw from this plea agreement.

15. If the government does not move the Court, pursuant to Sentencing Guideline § 5K1.1, to depart from the applicable guidelines range, as set forth above, this plea agreement will not be governed, in any part, by Federal Rule of Criminal Procedure 11(c)(1)(C), the preceding paragraph of this plea agreement will be inoperative, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to § 5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Sentencing Guideline § 5K1.1.

16. Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

### Presentence Investigation Report/Post-Sentence Supervision

17. Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope and extent of defendant's conduct regarding the charge against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to the issue of sentencing, including the nature and extent of defendant's cooperation.

18. Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the Court.

19. For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with

extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

20. This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 07 CR 799.

21. This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

22. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

      a.     **Trial rights.** Defendant has the right to persist in a plea of not guilty to the charge against him, and if he does, he would have the right to a public and speedy trial.

      i.     The trial could be either a jury trial or a trial by the judge sitting without a jury. Defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

      ii.     If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

      iii.     If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt. The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

      iv.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

      v.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant

would be able to confront those government witnesses and his attorney would be able to cross-examine them.

      vi.    At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

      vii.    At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

    b.    **Waiver of appellate and collateral rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 18, United States Code, Section 3742, affords a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e), defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Plea Agreement. In addition, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply

to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

c. Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

## Other Terms

23. Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

## Conclusion

24. Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

25. Defendant understands that his compliance with each part of this Plea Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable

statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

26. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

27. Defendant acknowledges that he has read this Plea Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _June 30, 2008_

_____
PATRICK J. FITZGERALD
United States Attorney

_____
JERRY LEFT
Defendant

_____
TIMOTHY J. CHAPMAN
Assistant United States Attorney

_____
THOMAS M. DURKIN
Attorney for Defendant